UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:19-CR-00117-ODW-8 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| EDGARD VELASQUEZ, | ) | Tuesday, October 8, 2019 |
| | ) | |
| Defendant. | ) | (11:06 a.m. to 12:02 p.m.) |

DETENTION HEARING

BEFORE THE HONORABLE ALKA SAGAR,
UNITED STATES MAGISTRATE JUDGE

<u>APPEARANCES</u>:

| | |
|---|---|
| For Plaintiff: | JOANNA M. CURTIS, ESQ.<br>Assistant United States Attorney<br>312 North Spring Street<br>Los Angeles, CA 90012 |
| For Defendant: | KENNETH M. MILLER, ESQ.<br>107 Avenida Miramar, Suite C<br>San Clemente, CA 92672 |
| Court Reporter: | Recorded; CourtSmart |
| Interpreter: | Ashley Nunez-Sheriff |
| Courtroom Deputy: | Alma Felix |
| Transcribed by: | Exceptional Reporting Services, Inc.<br>P.O. Box 8365<br>Corpus Christi, TX 78468<br>361 949-2988 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**Los Angeles, California; Tuesday, October 8, 2019; 11:06 a.m.**

**Call to Order**

**(Official Interpreter Utilized for Translation)**

**THE CLERK:**  Calling Case Number cr-19-00117-ODW-8, the *United States of America versus Edgard Velasquez*.

Counsel, please state your appearance for the record.

**MS. CURTIS:**  Good morning, your Honor.  Joanna Curtis on behalf of the United States.

**THE COURT:**  Good morning.

**MR. MILLER:**  Good morning, your Honor.  Ken Miller on behalf of Mr. Edgard Velasquez who is present and being assisted by an interpreter.

**THE COURT:**  All right.  Can I have the interpreter please state your appearance for the record?

**THE INTERPRETER:**  Good morning, your Honor.  Ashley Nunez, court-certified for Spanish (indisc.) on file.

**THE COURT:**  Thank you.  Mr. Velasquez, do you understand the translation that is being provided to you by the Spanish language interpreter?

**THE DEFENDANT:**  Yes.

**THE COURT:**  And if at any time you don't understand what is being stated here in open court can you please let me know immediately?

**THE DEFENDANT:**  That's fine.

**THE COURT:**  All right.  This matter is here on the

Defendant's application for reconsideration of the Court's Order of Detention. The Defendant filed his application on September 23rd, 2019 at Docket 296.

The Court then on October 4th, 2019 set this matter for a hearing on today's date.

The -- on September 23rd, 2019 the Defendant also filed exhibits supporting the application for reconsideration, those are at Docket 297.

The Government filed its opposition on October 7th, 2019 at Docket 310.

The Court has received and reviewed those filings, as well as the Pretrial Services Report that was issued today's date, the report that was issued on August 9th, 2019 at the time of the Defendant's initial appearance in this District, and the report that was issued on July 15th, 2019 at the time of the Defendant's initial appearance in the Western District of Oklahoma.

In addition to these filings the Court today received a document that is entitled "Alternative -- Alternate Straight Bill of Lading, Short Form" which Counsel for the Defendant indicated would be used at today's hearing.

Ms. Curtis, have you received a copy of this document?

**MS. CURTIS:** I have, your Honor.

**THE COURT:** All right. In addition to everything

4

that I have mentioned has anything else been filed in connection with this matter today?

MR. MILLER:  Not that I'm aware of, your Honor.

THE COURT:  All right.  So the Defendant's application for reconsideration of a Bail Order in this case proposes that the Defendant be released on the posting of property secured, property that is owned by the Defendant's, it's his sister and stepfather, is that right?

MR. MILLER:  Yes, your Honor.

THE COURT:  All right, and I think the amount is about 280,000, is that right?

MR. MILLER:  That's the amount of equity that we believe is available, and I would like, if the Court sets bond, I'd like it set a little bit lower in case the actual appraisal comes back lower than the Zillow estimate.

THE COURT:  All right.  And I just want to -- I didn't understand the significance of some of the exhibits that were filed in connection with the application so I just want to go over them with you to make sure I understand their -- how they support your argument, okay?

MR. MILLER:  Thank you, your Honor.

THE COURT:  So the first exhibit is basically for the value of the property, correct?

MR. MILLER:  Correct.

THE COURT:  Okay.  And the second exhibit purports to

be sort of a log of the truck that the Defendant was in in the course of his employment on June 28th?  27th?

**MR. MILLER:**  27th through 29th, your Honor.

**THE COURT:**  All right.  Tell me what the significance of this is.

**MR. MILLER:**  Okay.  The significance is one of the arguments that the Government made at the initial bail hearing was that Mr. Velasquez had traveled to Juarez and that he was -- denied that or wasn't forthcoming with Pretrial Services.

These logs, I submit, show that he did not go to Juarez, these are the truck logs and they show that he departed Centerville, Georgia at 12:45 p.m. on the 27th, and you can keep going through, and on Page 15 it shows they passed -- he and Anna Membrano (phonetic), who was his co-driver, passed El Paso at 5:47 p.m. on the 28th, and then they arrived in Tula Vista, California at 8:00 a.m., I had incorrectly said 10:00 a.m. in my papers, but it's 8:00 a.m. on June 29th.

That is about 33 hours.  A Google estimate of how long that trip takes without traffic is 32 hours, and judging by the cities they went through to not hit traffic would be impossible, so that's one thing.

Number two, it shows that they didn't even stop in El Paso if you look at the way this works, so -- and Anna Membrano is telling me that they didn't stop, so I would proffer that, so the main point of this is to show the distance they

6

traveled, how long it took them to do it, and that they never stopped in El Paso and so there was no opportunity for him to go to Juarez.

Another thing that I reference in my Declaration, but I could not submit because I couldn't make a printout of it that was accurate, was I contacted the trucking company and they gave me a printout of their GPS log that shows the truck never went to Juarez, it passed right through El Paso.

This last page of Exhibit 2 I thought was important, it just shows how close El Paso and Juarez are and I did not explain why I submitted that and I can understand why that would certainly be confusing, and that is because there is no foundation that a Facebook posting is so accurate that it could tell the 400 feet difference between El Paso and Juarez, and the Government has put forward this Facebook page and as far as I'm concerned there is no foundation for it for what it actually shows.  It's a posting in Juarez.

But as you drive through El Paso Juarez is right there, I mean, you see it as you're all the way through El Paso, when you enter on the east side all the way out to the west side that's Juarez right there.  So the idea that this geo location could make Mr. Velasquez a liar I just think that they would need a lot more than that in the face of a GPS tracking that shows they didn't do it, a trucking log that shows they didn't do it, and the trucking log, by the way, is also -- it's

attached to the truck so it's not just manually entered, the truck seems to know where it is is my understanding from the trucking company.  So -- and just the timing of it, there was no time to stop to go to El Paso so that would -- that seemed to be an important point that he was misleading Pretrial Services about that, and that was the point of Exhibit 2.

THE COURT:  All right.  So basically what Exhibit 2 shows is that the truck did not go into El Paso, Texas?

MR. MILLER:  Right.

THE COURT:  I'm sorry, did not go into Juarez, Mexico?

MR. MILLER:  The truck -- not only did the truck not go in, but the timing is such that Mr. Velasquez would not have had time to go in, and I think weighed against that a Facebook posting is -- without any sort of foundation is simply insufficient to show that he did.

THE COURT:  All right, but you're not contesting that there was a Facebook posting indicating that he was in Juarez, Mexico?

MR. MILLER:  No.  I'm not -- well, I'm not contesting that there was a Facebook posting that references Juarez.  It's not that he was in Juarez -- I mean, he posted --

Your Honor, I don't do Facebook so I don't know -- what I'm saying is I don't contest that he posted that thing that the Government submitted.

8

THE COURT:  Okay.

MR. MILLER:  I don't contest that.

THE COURT:  Okay, what does the post show?

MR. MILLER:  The post shows -- it says:

"Ferman Gomez (phonetic) checked into

(indisc.) Juarez June 28 at 4:17 p.m."

And then it says "(indisc.) G. Guerrero."

Which as far as I can tell is maybe an area of El Paso or it's a -- even on Wikipedia I couldn't actually tell what that was, but -- so there was a Facebook posting.

THE COURT:  Okay.

MR. MILLER:  But what that means when you are that close to Juarez I don't know and I don't think that it's sufficient to put that on the scale against the Defendant in the face of all of the evidence that it's very unlikely that he could have gone to Juarez on that trip.

THE COURT:  Okay, and unlike the truck, which is GPS monitored, a Facebook posting is not GPS monitored, correct?

MR. MILLER:  I don't know.

THE COURT:  All right.

MR. MILLER:  But because the Government is proffering it I believe that they need to explain it, and not just explain it with "I think this is what it shows."

I find the prospect that a Facebook GPS posting could be accurate within 400 feet to be -- I mean, I would really

need to see that.  How they can track people to that, you know, that minute detail I think is unlikely.  I think that you could post that you're wherever --

According to my kids you can post wherever you are, you can say that you're someplace that you're not and you can just post it up there, but I don't know that.

THE COURT:  All right.  Exhibit 3 is the fix it tickets --

MR. MILLER:  Yes.

THE COURT:  -- that he received that you indicate was taken care of before his arrest in this case?

MR. MILLER:  Well, he fixed the ticket, he didn't actually submit it, so he got arrested before he could submit it.

THE COURT:  Okay.

MR. MILLER:  But I remember at the last hearing that it was important to your Honor that he seemed to be blowing off DMV tickets --

THE COURT:  Right.

MR. MILLER:  -- and so Exhibit 2 shows well on this one he took care of it, and then -- let me see, in Exhibit --

THE COURT:  And the next exhibit is that he didn't realize he had to pay a $25 payment --

MR. MILLER:  Right, after paying a lawyer $800 to take care of the ticket.  And I don't know how much Spanish, if

10

any, your Honor speaks, and I didn't provide any sort of translation, but on Page 29 is the retainer agreement and it says:

"**(indisc.)** Van Nuys."

And I know limited -- I know just enough Spanish to get myself in trouble, but I know that means the person was retained to fight a traffic ticket in Van Nuys, and that on the second page it says there was a contract to pay $800, and then it's got the attorney's name there.

And then on Page 31 it shows an agreement to appear, that the case was continued and it's got the citation number in Van Nuys, Department 102, for March 18th.

And then the Page 32 are what appear to me to be attorney notes saying they appeared on 03/18, the failure to appear was dismissed, all Mr. Velasquez had to do was pay an additional $25 which I will proffer he didn't realize he owed more money on.

**THE COURT:**  All right, but he was there in court on the 18th?

**MR. MILLER:**  No, just the attorney.

**THE COURT:**  Just the attorney, all right.

All right, and then this document that I was provided with this morning, what is the significance of this?

**MR. MILLER:**  This last document is the Government has been alleging that Mr. Velasquez fled when a search warrant was

11

executed.

THE COURT:  Uh-huh (yes.)

MR. MILLER:  And what this shows -- and he fled --
fled in his truck.

What this shows is there was actually a contract that
is dated July 13th, 2019, which was the day the search warrant
was executed, and he signed it, and Anna Membrano, his co-
driver, signs it and they're supposed to get this load to
Charlotte, North Carolina by Monday.  And I submit that it's --
you don't --

I've got two parts, but the first part is you don't
set up a contract like that, you know, at 6:00 in the morning
when you realize that there is going to be a search warrant at
your house and you go down real quick and say "Hey, can you get
me a load so I can get out of here?"

Additionally, I have --

THE COURT:  Where do you see "6:00 a.m.?"

MR. MILLER:  Oh, it does not say 6:00 a.m. on it, it
does not say that, it just says "July 13th."

The -- I would proffer that they left somewhere
between 6:00 and 7:00 a.m., and I would also -- I showed the
Government prior to this hearing a text message that I got from
Anna Membrano showing or purporting to show that this was set
up on Thursday, July 11th, long before --

I mean, I'm sure the Government wasn't giving anybody

notice that a search warrant would be executed, so on July 11th they set up this trip to leave on July 13th so they were not -- the whole trip was not set up to flee.

And then I would point to the Government's exhibit, I believe it's Exhibit A, which shows, and I think their papers show, that Mr. Velasquez posted this picture of the Flying J in Arizona --

**(Counsel confers with Defendant)**

**MR. MILLER:** Okay, that he's posting pictures while he's traveling in this truck of where he is, and I submit that people who are fleeing law enforcement don't do that, it's a bad idea if you don't want people to find where you are to go ahead and post on your Facebook page pictures of where you're at that evening and that's what he was doing.

So the --

**THE COURT:** Okay, and what about the fact that just a little while later he posted something saying that he was going to Oregon, but he wasn't?

**MR. MILLER:** I don't think he posted something that said he was going to Oregon, he posted a picture of somebody driving in Oregon. I do not believe he said he was going to Oregon. The man likes to post what he believes are cool pictures.

And I would also point out that he never got out of the -- these trucks can be tracked. The Government presumably,

and I don't think he would know that they couldn't, could go to King Transportation and say "Where is this truck going?  Is it on a GPS?" and find out exactly where he is, but he never -- he never left the truck, he didn't get out of the truck.  When the truck was pulled over and the police asked him to come back, they said "What's your name?" and he said "Edgard Velasquez."

So I submit that his behavior was inconsistent with a man who was fleeing.

And then the last point I'd like to make, your Honor, on the flight risk stuff is I would -- and this is tough for me.  I went back and looked at the Pretrial Services Report this morning and I don't believe he was deceptive at all about his place of residence.

The -- I mean, we've got it right here, and it is my fault for not, you know, making this clear at the hearing, but this is what the Pretrial Services Report says: -- let's see, let me find it before --

**THE COURT:**  Are you looking at today's report?

**MR. MILLER:**  I'm looking at today's report, but I'm looking at they attached the last report to the back, and so I'm looking at Page 3 --

**MS. CURTIS:**  Page 2 under "Residence."

**MR. MILLER:**  Oh, Page 2 under Residence, thank you.

It goes:

"The Defendant indicated he has lived with his

14

mother, sister and other relatives at the following

address since 1999, 8501 Ventura Canyon.  He also

indicated he lives with his girlfriend and their two

children on and off at the following address:  78717

Jameson Avenue, Reseda."

That, by the way, if the Court grants bail he would

like to live at.

"He indicated if released he stated he would reside

with his girlfriend."

And no prior other residence is indicated.

When you look at the fact that he's got, on his

driver's license and on his -- the registration in his car he

puts a permanent address, but he says "I would live with my

girlfriend, that's where I would be."

That, to me, is not deceptive at all.  And, in fact,

if you're, you know, -- it's not his wife, it's a girlfriend,

these things can come and go.  I can understand why a person

would not want to change his permanent address to his

girlfriend's address if that might be -- if you're just not

certain what the future is going to hold.  So when I look at

that I do not believe that he was -- that there was anything

deceptive about that.  Somebody could say you should say it

different, but when you've considered all of the addresses that

he has that are tied to Panorama, to Panorama City, and that he

explicitly said "If I get out of here I'm going to live with my

girlfriend," I don't see anything deceptive about that at all. And even if somebody felt misled it's not materially deceptive because he's saying where he would go.

And then -- so if your Honor doesn't have any questions -- any more questions about those materials then I would just like to talk a little bit about his criminal history and the danger to the community.  Yes.

**THE COURT:**  So is it your position that when the law enforcement showed up at the residence of his mother where he -- where they thought he lived at 6:00 a.m. on July 13th, and then subsequently showed up at his girlfriend's house and he wasn't there, but other family members were, you know, at the first house and I don't know if anybody was at the girlfriend's house, that after that period of time nobody in his family got in touch with him to tell him about the search and the fact that law enforcement were looking for him and he just -- you know, he had a phone 'cause he was using it to post pictures, but he didn't know that law enforcement was looking at him and he was at this -- what was it, the Flying J Travel Center, and his -- according to GPS stayed at -- his phone was there so he was probably there, and then when the law enforcement showed up to, you know, go through and determine -- check every truck that he just very innocently just left because he had to go, you know, deliver his load, but he didn't realize that anybody was looking for him, and then he just very sort of casually

posted a photograph of some place in Oregon, and -- is that your position?

**MR. MILLER:**  Well, if we could break that down --

**THE COURT:**  Because it just seems to me a little odd that so many -- 19 people at the residence when it was searched at 6:00 a.m., that nobody reached out to him to tell him that law enforcement was there.

**MR. MILLER:**  I would like to break that down a little bit and I'm going to ask my client that question in a moment if and when anybody reached out to him.

But the thing that I think is important here is if you look at the Government's picture, the Google earth picture of that Flying J, it is huge --

**THE COURT:**  Right.

**MR. MILLER:**  -- and you're not necessarily going to know and see anybody looking around for you.

And if you're posting pictures of the fact that you're there at that point you don't know, you presumably don't know anybody is looking for you.

But if you -- may I have a moment?

**THE COURT:**  Yes.

**MS. CURTIS:**  And just in case, so we don't have any maybe false information, my understanding is that the Defendant did know and someone did call him, and that he stated the same thing to the Oklahoma Troopers.

17

MR. MILLER:  Okay.

MS. CURTIS:  So that's what our position would be.

MR. MILLER:  Okay, thank you.

(Counsel confers with Defendant)

MR. MILLER:  Your Honor, my understanding is he was informed by his uncle prior to the Flying J that the police were looking for him.  His uncle gave him a number that the police had left and his plan was after he delivered the load to contact law enforcement.

THE COURT:  All right.  And then I just remembered that in the Government's papers they indicated that after he left the Flying J he deleted those photos that he had posted and then, instead, posted -- it says he posted a video of Defendant heading into Oregon, so it wasn't just a picture of someone driving into Portland, Oregon, it was a picture of him, and obviously we know that he wasn't actually heading that way. So your belief would be --

MR. MILLER:  My position on that is --

THE COURT:  -- that he just posted it because he liked to post it?

MR. MILLER:  Yeah.  He posted it just because he liked to post it.

THE COURT:  Yeah.

MR. MILLER:  And I would point out, again, that he was informed before the Flying J --

18

THE COURT:  Right.

MR. MILLER:  -- that they were looking for him and he still posted his location of the Flying J.

THE COURT:  Right.  And that was just very innocently deleted, those photos of the Flying J when he left?

MR. MILLER:  Your Honor, I believe that he regularly deletes photos, he posts them and then deletes them, and I don't think that any negative inference can be taken from that if, again, I am not a regular Facebook user, but I do believe people post things and taken them down all the time.

THE COURT:  All right.  Let me hear your argument on the danger to the community and, you know, I am aware of the seriousness of the allegations in the Superseding Indictment in this case.

MR. MILLER:  Okay.  I think -- what I'd just like to focus on there is that they really -- it depends on the allegations.  The ones that are in 2017 are quite serious, but I would -- I think that it's --

THE COURT:  Those are the ones involving the shot, calling them murders, and getting proof of the murders actually being executed?

MR. MILLER:  Yes.

THE COURT:  Okay.

MR. MILLER:  And what I would like to point out about that, your Honor, is that juxtapose this case with the *Herr*

*(phonetic)* case where the Government cited in their papers where you could have a person who had no criminal history, but still be judged to be a danger to the community.

In that case there was a presumption that the person be detained.  There is no presumption here.

And the other big point is there was actual evidence. Here, we haven't seen -- I haven't seen any evidence of any of this.  I do not know what it's based on, but going back to *Herr*, there was actual evidence of a commission of supporting terrorism.  The Defendant had literally sent money and supplies, including two-way radios that could be used for IEDs. Searches of his house turned up guns, ammo, Jihadist literature and training material, so in that case you had actual evidence presented to the Court to justify the allegations.

And in this case I have -- we have no idea, other than basically an assertion, an Indictment that these are what happened.  The standard here is clear and convincing evidence, and the Indictment can be returned basically on probable cause, so without more I submit that it's insufficient to find that he engaged in that conduct.

THE COURT:  Do you have any discovery?

MR. MILLER:  No.

THE COURT:  Okay.

MR. MILLER:  And if it -- you know, we could go back and talk about the earlier ones, but I think that those would

be the sticking points, what's happening in 2017.  I can pick at the other ones like, you know, 10 years ago he was -- well, I won't say that.

You know, he's in a car with bullets that's not his car and there is no evidence that he is aware of the bullets. I mean, he drives this '07 Lexus, that was a 2010 Honda.

A reference, somebody referring to a trucker as being in the MS-13.  What -- I think that's very vague.

Carrying cash beneath the -- apparently -- I don't know if he was arrested or what, but that's 10 years ago.

**THE COURT:**  But it's 1.2 million dollars in cash.

**MR. MILLER:**  Yeah, but it was 10 years ago, your Honor, and so to say that now there's no -- there's nothing that could be done to make sure that he's not doing that I think is -- that is a lot of money and I do not -- there's no way that I would minimize that, but I would point out to the Court it is 10 years ago, and that's -- you know, there's no more transporting of money in between there.

Then you've got -- well, you do have an April 2017 selling marijuana on the East Coast, $900 worth of marijuana.

Your Honor, this case is set for trial currently in January 2021, and there is a very good chance it is going to be continued beyond that.

At the last hearing I misspoke and said that they were seeking the death penalty against everybody and there --

that decision hasn't been made yet, but they are death eligible, and those cases do take a long time, and so my -- what I submit is this evidence is too thin to put somebody in jail for the next, you know, at least the next year and a half and maybe, you know, years and years before this case gets to trial, and so -- yes?

THE COURT:  All right.  And then the other question I had, and this goes back to lack of candor with Pretrial Services, is he said that he was no longer a member of the MS-13 or the Fulton clique and got out in 2005, or he got -- and his girlfriend said he got out 10 years ago, and yet the Government, in its papers, indicates that he attended sort of meetings with high level people in the gang as recently as like 2015, they have -- apparently they have video --

MR. MILLER:  They keep raising that, your Honor, and that's a troubling one, but not for -- for me, not for the reasons that the -- so much that the Court says.

They -- that is -- that -- whether or not he is a member or a current member of the Fulton clique is at issue in this case, that is what the trial is about or it's a material element of the trial, and without any discovery it is very difficult to address that, it is a mere allegation, that's the one thing.

The second thing that's troubling about this, your Honor, and I'm not sure how to deal with it, but if Pretrial

Services is going to be inquiring about the underlying facts of a case, of a criminal Defendant for a Pretrial Services Report we are going to be in a position where Defendants have to confer with counsel before they're allowed to meet with Pretrial Services.

My prior understanding is -- from '91 to '93 I was a Federal Public Defender, and then I was a panel attorney for a number of years, and then I've been kind of not doing panel work for the past 12, but now maybe things have completely changed, but if our clients are going to be questioned about the underlying facts of the case by Pretrial Services the system is going to have some real serious problems because counsel will need to be in there --

**THE COURT:**  I don't think he was questioned about the facts of the case, I think he had a gang tattoo --

**MR. MILLER:**  Uh-huh (yes.)

**THE COURT:**  -- and he was asked if he was a member of any gang which I think is a sort of standard, you know, item that is on their checklist to ask because it does go to dangerousness.  And in this case, in particular, the gang membership is, you know, a part of what's being alleged in the charges.

But regardless, even if he wasn't charged with anything involving a gang, if a Defendant has -- has any indication that he's a member of a gang they always ask, you

know, "Do you have any gang membership?" you know, that was the question that was asked and he said "I was, but I got out 10 years ago," and the Government is just pointing out that that wasn't -- you know, that could not have been true because he attended, apparently, meetings involving sort of high level members of the gang, so.

MR. MILLER:  I am not in a position to refute that because I haven't seen discovery, I haven't seen the video, but I am in a position to say that I do think that that's going to raise some serious concerns going forward, particularly in a case that involves RICO allegations based on the gang that Pretrial Services is asking about.

THE COURT:  All right.  Okay.  Is there anything further that you want to add to the arguments you have made in your papers?

MR. MILLER:  May I have a moment?

THE COURT:  Yes.

MR. MILLER:  Thank you.

(Pause)

MR. MILLER:  Nothing further, your Honor.  Thank you.

THE COURT:  All right.  Ms. Curtis, let me hear from the Government.

And I guess my first question is is discovery going to be provided at some point?

MS. CURTIS:  I certainly hope so.  We have been

having, and when I say "we" I mean Mr. Miller and all of the counsel have been having trouble getting a Protective Order in this case.

We came to an agreement in August.  I filed an ex parte application for a Protective Order.  Three counsel objected; counsel for 19 of the Defendants had no objection, I submitted that Order.

The same date Judge Wright issued a Minute Order and he wanted the Protective Order in our case to be far more restrictive, and so restrictive that he wanted only the lawyers in the case to be able to have access to the discovery.

I have a concern about that and the integrity of any conviction that I may receive in this case if mitigation experts, investigators and paralegals and staff at counsel's office can't see the discovery, so that was a little startling and I've had lots of Protective Orders with this particular gang with Judge Wright and that has never happened before.

As you can imagine that startled a lot of us.  We have had -- me, I have had meetings upon meetings with the Defense counsel, telephone calls, emails.  I hosted an in person meeting in my office last month.  Mr. Miller, I believe, was on the phone and there were probably about 25 counsel who showed up in person and there were more counsel on the phone, as well, so we could try to hammer something out.

At this point we think we have hammered something out

and that was as of about a little over a week ago.  It took until yesterday for me to wrangle all the lawyers to let me know their position on the stipulation.  As of yesterday at about 12:45 I had all -- counsel for all 22 Defendants signed onto the stipulation, I filed it yesterday at 1:30, checking my phone every 10 minutes and it's still -- still the Order hasn't come through.  So -- but that's an issue for another day.

THE COURT:  And so if that Order comes through then you are prepared to turn over the discovery?

MS. CURTIS:  Yes.  And I told Mr. Miller my desk is filled with hard drives containing all of the discovery just waiting to go out as soon as I get that Order.  And I have been in very regular communication with counsel about the discovery, the Protective Order issue and the status of their hard drives.

THE COURT:  All right.  Well, you have heard my questions to Counsel about the request for bail.

I have received and reviewed the Government's opposition.

Why don't you address some of the issues that Defense counsel has raised about why the Government's arguments don't really support their claim that he -- that release in this case under any conditions would not be sufficient to guard against flight or danger?

MS. CURTIS:  And I think -- and I don't want to be repetitive, I think I've said everything in my papers, really.

I mean, I have a -- I actually have things I could say on everything that he presented.

And, really, I tried to make sure in my papers that I wasn't overstepping or over-promising.  I don't know what was in the Defendant's mind, all I can present to the Court with respect to that particular day are the facts as I know them, and what I know is that I don't think the Defendant was at either of the residences, the family home or the girlfriend's home where he shares two children, and so I do think it's an unfair characterization to describe his girlfriend's home as a fleeting home, that something may go wrong and he may not live there anymore when he has two children there, so I don't know that that was fair.

But what I do know is that his phone was there and it wasn't until an hour and 20 minutes into the search when everything was even perhaps finishing up, that his phone left the area.  What I'm suggesting --

**THE COURT:**  Were the two searches done at the same time?

**MS. CURTIS:**  Yes.  And to be fair there was only a search of the family home because that's where we believe the Defendant lived, not the girlfriend's home.  The girlfriend's home was surrounded such that no one -- no one left the home, no one snuck out, so that's why we think he was at a third location, not girlfriend's, not family.

And so all I can explain to the Court is that I also find it very suspicious that not one of these family members would have called the Defendant.  And I'm not suggesting that he didn't already have this trip planned; I'm suggesting that he knew probably while he was in Los Angeles that agents were searching the home, searching for him.  It says on the face page of the warrant "Racketeering" and everything else, and he left about an hour and 20 minutes later.

I don't know that the Defendant knew that we were tracking his phone or that we were monitoring his Facebook account.  I guess he could have known that, possibly, but we also didn't know what truck he was driving so there was no way for us to figure -- to know what truck he was driving and to call a trucking company to find out where Defendant was.  And, my goodness, being involved in that over the weekend that sure would have been helpful because we had a photograph of the Defendant that we were, you know, giving out to all of the law enforcement and all of the states and agencies that I mentioned in my papers, and the Troopers were literally driving on the freeway looking into trucks.  And then when we saw those posts the agents -- it wasn't clear where the Defendant was either, he didn't say "This is I'm at the Flying J in this city in Arizona."  Based on the data we were getting from his GPS from the phone the agents had to look at Google Earth to look in that area, the large area, and we found the Flying J and it

28

turned out apparently that is where the Defendant was.  So at that point the Arizona Troopers are doing the same thing, going truck to truck with the photo, we didn't know what truck it was, and all I can say is that, once again, the Defendant was there, he was there for some time, and then after the agents -- after the Arizona Troopers were looking truck to truck, at that point that's when the truck left.  I don't know if it was his intention to stay there overnight or it was just a stop, but those -- the Arizona posts were deleted, and I can't say anything about why the Defendant deleted those photographs.

Of course, from my perspective I think he didn't -- probably until that moment he didn't realize that agents were monitoring his Facebook account.  And I do think that he deleted those posts and then posting the picture of driving in Oregon, I think that was -- I would argue that that was intentional because if he thought -- he didn't realize that we had this going and we were just looking at his Facebook; perhaps he thought that that would help.

With respect -- and, again, that's why I'm arguing, I think it's consistent with flight.  I don't know what was in his mind, I'm just arguing that it's consistent with flight.

With respect to the exhibits the Defendant submitted with respect to the Juarez post, once again our evidence is that there is a Facebook post where he posted it and apparently he's not disagreeing where he checked into Juarez.

The logs, I think, they don't show starts and stops of the truck, they show engine on, engine off, so certainly the car could be idle, neutral, parked and those logs aren't reflecting that, it's only showing engine on, engine off.

At the time when the Defendant could have checked into Juarez his ex-girlfriend and mother of at least one child, Anna Membrano, was driving that truck, so is it possible that Defendant could have gotten out and done whatever he wanted to do or been picked up?

Certainly.  I don't have that information, but certainly I would argue that the evidence that the Defendant submitted, it doesn't really do anything to rebut the Government's evidence that the Defendant, in fact, checked into Juarez on Facebook.

THE COURT:  When you check into a place on Facebook are you -- I mean, can you just say that you're there, but you're not really there?

MS. CURTIS:  My understanding is that you can't, and in Facebook --

THE COURT:  That you can or cannot?

MS. CURTIS:  Cannot, that you get a -- it's also based on GPS, you have to turn your location services on on your phone to even be able to access that, so it will come up -- a list of options will come up, right?  You could say you're in Juarez, you could say you're at a particular bar here in Los

30

Angeles, you can say, you know, Beverly Hills, Los Angeles, a restaurant, a particular restaurant.  People check into restaurants to let people know where they are, why they do that I don't know --

THE COURT:  But you can't be sitting in Los Angeles and saying I'm in Paris?

MS. CURTIS:  No, that is my understanding that you can't, and it is based on location services.

THE COURT:  Okay.

MS. CURTIS:  Although I don't want to argue with Mr. Miller's children, that is my understanding.

THE COURT:  You had also mentioned that when he was ultimately arrested in Oklahoma that he acknowledged that he knew that law enforcement was looking for him?

MS. CURTIS:  He acknowledged that he knew that they were searching his house that day, or there were people searching his house, and that's all we have.  And because that's -- that was something that was said to the agent at the time, and I don't have that memorialized, I don't even include it in my papers, I just didn't want to get Mr. Velasquez into a position where he would say something, perhaps, before he had a chance to know what my understanding was.

So that's what I think about that.

And I do think that -- I understand Mr. Miller's point that the Defendant uses that address, his family's

31

address, but then through a (indisc.) address for his DMV-related, you know, business.  But I also think when you're asked where do you live, and you don't actually live there, and this statement that he has lived there with his mother, sister and other relatives since 1999, I mean, I think flat out I think that is just wrong.  I think that's inaccurate.

When we went to the house and I noted the individuals who the FBI spoke to that morning, and I think one of them was Defendant's brother, Defendant's brother and I think his mother at another time, perhaps Pretrial indicated that the Defendant did not live there and had not lived there for years, and so I don't think -- I don't think that it's fair for Defendant to say "Well, I use that address even though I don't live there for the DMV, and so it really wasn't deceptive."

I think when you're asked "Where do you live?" I think there's only one answer and that is where the Defendant actually lives, and that's the Jameson address with his girlfriend and his kids, and so I don't think --

And also being very specific that "I've lived there with my mother since 1999."  For purposes of a Pretrial Services officer that's a point very favorable to Defendant, and I think Defendant wanted Pretrial Services to believe that.  And when the agent searched the residence there wasn't a piece of mail, there was nothing with the Defendant's name, there was nothing tying him to that house, and so I think his family

32

members' representations that he hasn't lived there in years, coupled with the fact that they were corroborated by the fact that when the agents did search the house there was nothing belonging to the Defendant, I think I feel comfortable saying he didn't live there, he doesn't live there on and off, he lives with his girlfriend and that's his address.

THE COURT:  Okay.

MS. CURTIS:  And that's all I'm saying is that, you know, when he reported this to Pretrial he didn't -- and perhaps he regrets it now or made a mistake, I don't know, but the fact remains he said what he said.

With respect to the meeting, the September 27, 2015 meeting, that was a meeting involving as many shot callers of MS-13 in Los Angeles as could come to the meeting, I guess. The meeting was video recorded.  It was audio recorded.  The Defendant appears in the video, and not only does the Defendant appear in the video, we have surveillance photographs of the Defendant leaving the meeting.  We also have a photograph of the Lexus that the Defendant was driving at the time.

I know that -- I understand that Mr. Miller's argument is certainly now and when he hasn't seen the discovery and seen his client leaving that meeting or participating or at the meeting, to say that Defendant's MS-13 membership is a question in this case, and that is absolutely right, and I have to prove that at trial.  But to suggest that MS-13 -- the MS-13

33

leadership in Los Angeles, that somebody who is no longer a gang member, to attend their very important sensitive meeting when it's a meeting about what the shot callers and the leaders, that just doesn't make sense to me.  Out of everything I know about MS-13 that's not reasonable.

I think in addition to these things I think the Court already knows and I won't repeat it, I think the allegations are serious, and I also think the fact that he -- we allege that the Defendant is selling drugs to Fulton clique members in Maryland and in the truck when the officer stopped the truck it smelled like marijuana and, of course, they found a FedEx package full of marijuana in the truck, I think that is just consistent with and corroborates the allegations in the Indictment that the Defendant does transport drugs across country, that's exactly what we allege and that's exactly what we found when we arrested the Defendant and stopped him in his truck.

And, again, the allegations are serious.  The 2014 ordering another person to shoot someone, another subordinate; the subordinate does shoot and kill that victim in 2014, in addition to the 2017 allegations, I believe there are no conditions that can secure Defendant's appearance or the safety of the community.

THE COURT:  All right.  Mr. Miller, would you like to have the last word?

34

**MR. MILLER:**  Thank you, your Honor.

At the risk of repeating myself I'm going to -- I will do it just briefly.  Again, if you're at the Flying J why post your location if you're fleeing?

And the Government indicated we don't know if he planned to stay there overnight, you can look at the logs.  These are cross country truckers, they don't stay, and there's two of them in the truck for a reason, so they can continue to drive, continue to drive.  He would have been on the move.

The -- in terms of the Juarez post, I just -- it seems like so much conjecture to suggest that he could run across the Mexican border.  The Mexican border isn't a border like that anymore, it's pretty much fortified everywhere and you don't just zip back and forth, so --

And the Government's suggestion there is rebutted by the timing, the start and the stop time, and the distance of travel.  It does not leave time to do that.

As -- in terms of the Facebook post, again, the -- you can say well, you know, the -- Facebook geo locates, again, I don't know that, I don't think there's any sufficient foundation for that, but particularly when the Government has the burden of proof of showing a flight risk, that just seems -- that seems really unlikely.

And in terms of talking to Pretrial Services, when he says "If I get out I'm going to live in Jameson with my

girlfriend," that shows me that there is no intent to mislead at all.  You know, why be coy about that and then say you're going to go live with your girlfriend?

And then the marijuana in the truck, what I would really like to know is how much was there?

I mean, I would.  If you're saying that he's transporting marijuana across the state, is it grams that we're talking about?  Is it ounces?  Is it pounds?

I'm willing to bet it was a very, very small amount, and you got to realize, he is going to North Carolina, he's not going to Maryland, and then you got to realize that other people drive that truck as well.  The truck belongs to the company, not to him, so I don't think that that shows anything. And with that I would submit.

THE COURT:  All right.  Well, let me first just say, Mr. Miller, that your papers that you filed were, you know, excellent.  I don't usually get this kind of, you know, a pleading, arguments supported by exhibits in an application for reconsideration, and I do appreciate your efforts in that regard.

I have, you know, thought about this.  I have listened to the arguments of Counsel this morning and I very carefully read all of the documents that were submitted, the pleadings, the Pretrial Services Report and I have an understanding now of the exhibits that were filed by the

36

Defendant and their relevance to the argument.

The Court is not going to grant bail in this case. The Court concurs with Pretrial Services that notwithstanding the fact that I think the only difference really, the only additional information that has been presented to the Court here is the availability now of bail resources which were not available at the time of his initial appearance in this District.  Nevertheless, that alone does not -- does not support a finding that the Defendant would not -- would not be at risk of nonappearance given other factors that are still there.

He has foreign family ties.  He has a foreign passport and I think that he -- notwithstanding the fact that he is a legal resident of the United States, I am not considering in my decision the Government's argument that he was not candid with Pretrial Services because he checked in on Facebook in Juarez, Mexico because at this point there is no evidence that has been presented to the Court which indicates that when he was -- when he checked in on his Facebook that he was actually there.  I just don't have enough evidence to say that, you know, he could have checked in somewhere else, I would need more information about how Facebook works and how the -- how the GPS location monitoring, how accurate it is and given the very close, you know, distance between El Paso and Juarez, it's certainly, I guess it's possible, as the Defendant

37

argues, that he was not in Juarez when he checked in.

Nevertheless I have some concerns about sort of the events that transpired on July 13th. You know, Mr. Miller asks why would you post to be at the Flying J if you believed that law enforcement was looking for you?

Well, I think that at that point he may have known that law enforcement was searching his home and maybe had a warrant for his arrest, but he probably did not know that they had access to his Facebook postings or that they had GPS location information for his phone.

At some point when he left the Flying J he deleted those posts and I think the inference from that is that he knew at that point, either from what maybe he had observed at the Flying J with the law enforcement there checking the trucks, or maybe contact with his family members, he must have realized that law enforcement was -- knew where his location was or suspected that he was at that location, and that it seems would be the only reason why he would delete those postings of him being in the Arizona area and instead post a posting, a video of himself driving into Oregon.

So that, I think, demonstrates lack of candor with respect to the statements regarding gang membership. Again, I understand that you don't have the discovery and you can't really respond to those, but I do accept what the Government is saying in that if, in fact, he was at this meeting and it was a

38

meeting of high level people in the gang it would be inconsistent for him to say on the one hand that he was out of the gang if there was evidence of him actually being present at this meeting.  And, again, I understand that you don't have that evidence.

The allegations in this case are very serious.  His role in the acts and in the gang are extremely concerning.  He is not -- he's alleged to just not be a member of the MS-13 Fulton clique, but to actually be a shot caller and those are factors which notwithstanding his limited or minimal criminal history give rise to concerns about danger to the community.

And so the Court, for those reasons, concurs with Pretrial Services' recommendation that there are no conditions or combination of conditions to address the risk of danger to the community.  Even if the Court could impose conditions that could maybe address risk of flight, the Court doesn't believe there are, at this point, any conditions that could assure the Court that release on bail would not pose a threat to the danger to the community.  So for those reasons the Defendant is denied the application for reconsideration of the Order of detention in this case.

Mr. Miller, what would you like to do with the exhibit that was presented and has not been filed?  Do you want to -- if you want it to be part of the hearing today then I would suggest that you just file it as a supplemental exhibit

39

to your Declaration.

MR. MILLER:  Will do, your Honor.  Thank you.

THE COURT:  All right.  And do you want me to return the exhibit that was provided to me so that you can file it with the Court?

MR. MILLER:  Yes, your Honor.

THE COURT:  All right.  I'll have the clerk do that.  Thank you.

All right, is there anything further?

MS. CURTIS:  No, your Honor.  Thank you.

MR. MILLER:  No, your Honor.

THE COURT:  All right.

THE CLERK:  Court is adjourned.

**(This proceeding was adjourned at 12:02 p.m.)**

40

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    October 24, 2019

            Signed                                      Dated


                    *TONI HUDSON, TRANSCRIBER*